FILED

05/12/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0207

DA 22-0207

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 82

HELEN WEEMS AND JANE DOE,

     Plaintiffs and Appellees,

  v.

STATE OF MONTANA, by and through
AUSTIN KNUDSEN, in his official capacity
as Attorney General; and TRAVIS R. AHNER,
in his official capacity as County Attorney
for Flathead County,

     Defendants and Appellants.

APPEAL FROM:    District Court of the First Judicial District,
                In and For the County of Lewis and Clark, Cause No. ADV-2018-73
                Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Austin Knudsen, Montana Attorney General, Kathleen L. Smithgall, Brent
                Mead (argued), Assistant Solicitors General, Helena, Montana

                Emily Jones, Special Assistant Attorney General, Jones Law Firm, PLLC,
                Billings, Montana

        For Appellees:

                Alex Rate, Akilah Lane, ACLU of Montana Foundation, Inc. Missoula,
                Montana

                Hillary Schneller (argued), Center for Reproductive Rights, New York,
                New York

        For Amici National Association of Nurse Practitioners in Women's Health and the
        American College of Nurse-Midwives:

                Lindsay Beck, Beck, Amsden & Stalpes PLLC, Bozeman, Montana

Johnathan K. Youngwood, Simpson Thacher & Bartlett LLP, New York, New York

For Amici Legal Voice and Women's Law Project:

Mathew Gordon, Perkins Coie LLP, Seattle, Washington

Argued and Submitted: December 14, 2022

Decided: May 12, 2023

Filed:

_____
                        Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1      The State of Montana appeals the February 25, 2022 Order on Motions for Summary Judgment entered in the First Judicial District Court, Lewis and Clark County.  The District Court held § 50-20-109(1)(a) (2005), MCA, which restricts providers of abortion care to physicians and physician assistants (PAs), violated a woman's fundamental right of privacy to seek abortion care from a qualified health care provider of her choosing.  The District Court held the State had failed to demonstrate that Advanced Practice Registered Nurses (APRNs) performing abortions present a medically acknowledged, bona fide health risk.  We conclude there is no genuine dispute of fact that abortion care is identical to the care APRNs already lawfully provide in Montana; that abortion care is exceedingly safe; and that abortion care can safely be provided by APRNs.  Accordingly, there is no medically acknowledged, bona fide health risk for the State to restrict the availability of abortion care by preventing APRNs from performing abortions.

¶2      We affirm and restate the issue as follows:

> *Did the State demonstrate that abortions performed by APRNs present a medically acknowledged bona fide public health and safety risk sufficient to invoke the State's regulatory authority to restrict access to abortion care guaranteed by Montana's fundamental constitutional right to privacy?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3      Helen Weems, APRN-FNP, is the owner and sole clinician at All Families Healthcare, a sexual and reproductive health clinic in Whitefish, Montana.  She holds a license issued by the Montana Board of Nursing (Board) as a registered nurse and a certificate in the advanced practice of Family Practice.  Jane Doe, APRN-CNM, is a

licensed registered nurse with a certificate in the advanced practice of Nurse Midwives. Both Weems and Jane Doe (hereinafter, collectively called Weems) are authorized by the United States Drug Enforcement Administration (DEA) and § 37-8-202(1)(h), MCA, to prescribe prescription medication. Additionally, each may practice independently without supervision of a physician.

¶4 In 2005, the Montana Legislature amended § 50-20-109(1)(a), MCA, to add PAs to those health care providers who could provide constitutionally protected abortion care. As amended, § 50-20-109(1)(a), MCA, made it a felony for any licensed or competent provider, except physicians and PAs, to provide early abortion care. On January 31, 2018, Weems challenged the constitutionality of § 50-20-109(1)(a), MCA, claiming that the statute did not codify the full scope of this Court's holding in *Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364. Here, Weems argues *Armstrong* established that Article II, Section 10, of the Montana Constitution guarantees a woman a fundamental right of privacy to seek abortion care from a qualified health care provider of her choosing, absent a clear demonstration of a medically acknowledged, bona fide health risk. Weems maintains that limiting the scope of qualified health care providers to physicians and PAs conflicts with Article II, Section 10, and this Court's interpretation of that right in *Armstrong*, because APRN-FNPs and APRN-CNMs are qualified to perform early abortion care. Conversely, the State maintains that § 50-20-109(1)(a), MCA, *did* codify *Armstrong* because all that was at issue in *Armstrong* was whether PAs could perform abortions. The State argues it has authority to provide for the general health and safety of

4

Montanans and that early abortion care presents a risk of harm beyond what an APRN is capable of handling.

¶5 On April 4, 2018, the District Court issued a preliminary injunction enjoining the State from enforcing § 50-20-109(1)(a), MCA. The State appealed the preliminary injunction to this Court. On April 26, 2019, we affirmed the preliminary injunction. *Weems v. State*, 2019 MT 98, 395 Mont. 350, 440 P.3d 4 (*Weems I*).

¶6 After our decision in *Weems I*, the parties conducted discovery between May 2018 and June 2021 and filed cross-motions for summary judgment. On February 25, 2022, the District Court granted Plaintiffs' motion for summary judgment on their Article II, Section 10, claim, and enjoined the enforcement of § 50-20-109(1)(a), MCA.[1] Neither party has asked the District Court, or this Court on appeal, to revisit our decision in *Armstrong*. The dispositive conclusion made by the District Court, and the only one we address here, was that the State failed to "clearly and convincingly demonstrate a medically acknowledged, bona fide health risk which justifies interfering with a patient's fundamental right[.]" The District Court reasoned, "[t]he Montana Constitution protects not only a patient's right to seek and obtain lawful medical procedures, but also the patient's right to choose the health care provider who performs the procedure[,]" when that provider is licensed and competent. The District Court found that the "medical community clearly considers APRNs competent" to perform abortion practice. Both parties maintain that there is no genuine dispute of material fact which would render summary judgment inappropriate.

---

[1] The District Court declined to consider Plaintiffs' claims premised upon a violation of the right to dignity and equal protection and they are not, accordingly, part of this appeal.

5

¶7    The State appeals.

**EVIDENTIARY RECORD**

¶8    The evidentiary record on the parties' cross-motions for summary judgment focused on two general areas: (1) the delivery of early abortion care and associated potential risks; and (2) licensing, qualification requirements, and scope of practice for APRNs. Before addressing the substantive areas of evidence, we briefly address each expert witness' background and expertise.

¶9    The State disclosed expert witness Dr. George Mulcaire-Jones, a family medicine and obstetrics physician in Butte, Montana, who specializes in Cesarean sections, surgical management of miscarriages, and care of high-risk pregnancies. In his deposition, Dr. Mulcaire-Jones testified to his experience in women's health, pregnancy, pregnancy-related surgery, pregnancy termination, treatment of post-abortion complications, and abortion risk factors. The State also disclosed Dr. Kathi Aultman as a rebuttal witness. Dr. Aultman is an obstetrician-gynecologist (OB-GYN) licensed in Florida who serves as a fellow of the American College of Obstetricians and Gynecologists.[2]

¶10    Plaintiffs disclosed three expert witnesses: Dr. Suzan Goodman, a family medicine physician licensed in California with a Master of Public Health; Dr. Joey Banks, a family

---

[2] The Eastern District of Virginia found Dr. Aultman "was not current on the medical aspects of abortion; indeed, she last performed an abortion in 1982." *Richmond Med. Ctr. for Women v. Gilmore*, 55 F. Supp. 2d 441, 449 (E.D. Va. 1999). Dr. Aultman's expert testimony has also been discredited by other courts. *See Planned Parenthood of Greater Iowa, Inc. v. Miller*, 30 F. Supp. 2d 1157, 1165 n.9 (S.D. Iowa 1998); *Little Rock Family Planning Servs. v. Rutledge*, 397 F. Supp. 3d 1213, 1301 (E.D. Ark. 2019).

medicine physician licensed in Montana; and Laura Jenson, an APRN-CNM licensed in Oregon with a Master of Public Health and Science. Both Dr. Goodman and Dr. Banks currently provide abortion care. Jenson practices in an outpatient setting where she provides obstetric care, miscarriage management, contraception, and annual health care for women. She also trains APRNs regarding their scope of practice and works with the Oregon Board of Nursing to review and revise Oregon's APRN regulations.

¶11 We now summarize the evidence presented to the District Court, organized by the two substantive areas we have identified.

**Abortion Care and Associated Potential Risks**

¶12 Medication and aspiration abortion are the most common types of early abortion care. Medication abortion involves the ingestion of pills to terminate the pregnancy. A patient first takes mifepristone, which terminates the pregnancy, and then takes misoprostol, which causes the uterine contents to pass in a process identical to miscarriage. Patients early in their pregnancy prefer medication abortion for many reasons: they can complete the process in a private place of their choosing; they can avoid fear of harassment for their decision; and they can avoid potential violence from family members. During an aspiration abortion, a clinician dilates the patient's cervix and inserts a thin tube through the cervix into the uterus and, with suction, removes the uterine contents. According to the expert witnesses—including the State's expert witnesses—medication and aspiration abortions are very similar and use techniques and protocols identical to that used for managing a miscarriage or a stillbirth. The State does not dispute that APRNs currently

manage miscarriages and stillbirths. Likewise, the State does not argue that APRNs present a bona fide health and safety risk to Montanans when they provide miscarriage care.

¶13   Dr. Mulcaire-Jones, the State's expert, opined that while APRNs may be able to perform an abortion procedure, they are not trained to handle the full set of complications which can result from an invasive surgical procedure such as an aspiration abortion. Dr. Mulcaire-Jones explained that an aspiration abortion is a surgical procedure involving the removal of tissue from the uterus with instruments, which may cause bleeding, cramping, and possible infection. Dr. Mulcaire-Jones opined that there was an unacceptable risk to women when abortions are performed without emergency backup systems in place, such as when APRNs perform abortion care in their office. According to Dr. Mulcaire-Jones, "[t]o have to travel to have an abortion in a safe setting where standard of care measures are more likely to be met is no different than a patient who must travel for any other type of elective surgery, which would require post-operative care and monitoring." He opined that medication abortions also carry risks of hemorrhage and bleeding and, consequently, could require post-abortion care beyond what an APRN is capable or authorized to provide. According to Dr. Aultman, the State's expert rebuttal witness, "[a]llowing less qualified practitioners to perform abortions, especially when they cannot handle the serious and life-threatening complications that can occur, creates an unacceptable risk for patients at any location, [which] expands exponentially in rural areas without the necessary facilities and expertise to handle complications."

¶14   Conversely, Dr. Goodman stated "[l]egal abortion is one of the safest medical procedures in the United States." She elaborated, "[c]omplication rates of abortion are

8

similar to or lower than other outpatient procedures." Further, relying on various cited scientific studies, Dr. Goodman explained "[t]he risk of death associated with childbirth is approximately 14 times higher than that associated with abortion, and pregnancy-related complications are more common among women having live births than among those having abortions." Dr. Goodman noted that national studies found the prevalence of rare minor complications[3] during first-trimester aspiration abortion among physicians, PAs, APRNs, and CNMs, was 1.32% and the prevalence of major complications from abortions requiring hospitalization, regardless of clinician type, was 0.05%. As a comparison, abortion care has a lower prevalence of complications than other common procedures such as wisdom tooth removal (7%) and tonsillectomies (between 8-9%).

¶15    Additionally, Dr. Goodman opined that "nearly every complication associated with medication or aspiration abortion can safely be managed in an outpatient setting." For example, in most cases of hemorrhage—a rare event—patients are treated in the clinic with medications that increase uterine contractions and reduce bleeding, or by repeat aspiration. Incomplete abortions and associated infections can also be managed in an outpatient setting with medication or repeat aspiration. Thus, when abortion-related complications do occur, they typically are minor, easily treatable, and can be safely managed by properly trained clinicians in an outpatient setting or by the patient at home.

¶16    The record also established that abortion services are tied to provider availability— the number of providers who actually provide early abortion care—not the total number of

---

[3] Rare minor complications include incomplete abortion, bleeding not requiring a transfusion, and uncomplicated uterine perforation.

physicians or PAs located in the state. Only three clinics in Montana offer regular aspiration abortion care: a Billings clinic that provides abortions up to 21.6 weeks following the day of the patient's last menstrual period (LMP); a Missoula clinic that provides medication abortions up to 10 weeks following the day of the patient's LMP and aspiration abortions up to 18 weeks of the patient's LMP; and Plaintiff Weems's clinic in Whitefish. On varying days, a health center in Helena offers abortions up to 14.6 weeks following the day of the patient's LMP and a clinic in Great Falls only offers medication abortion when they have a provider available. In her deposition, Dr. Banks highlighted research establishing that the median distance a patient must travel for early abortion care in Montana increased by nearly 50 miles between 2011 and 2014. By 2014, women in Montana had to travel on average 180 miles or more to reach their closest abortion provider, making Montana one of the few states in the nation with such limited provider availability. Dr. Banks provided that as of 2017, over 90% of counties in Montana had no abortion provider and roughly 50% of Montana's population lived in these counties.

¶17 Due to limited provider availability, women seeking early abortion care must often travel great distances, requiring long travel times to access a provider. In addition to finding the funds and means to travel, women must arrange for time off from work, make family arrangements, and ensure funds are available to pay for care. Dr. Goodman explained that difficulties associated with travel can result in delays in accessing abortion care and have "safety repercussions." The scarcity of providers can cause women to experience delays accessing care, forcing them to remain pregnant until they can seek a "later-term abortion," which may result in comparatively higher risk, greater financial

expenses, and even ineligibility for medication abortion[4] as pregnancy advances. The evidence established that the availability or unavailability of even one abortion provider can significantly impact access in Montana.

¶18 Finally, Dr. Goodman reported that it is uniformly established that APRNs can provide early abortion care with the same safety and efficacy as physicians and PAs. Dr. Goodman relied on the "most comprehensive study done" which compared complications from aspiration abortions between physicians, PAs, APRNs, and CNMs. The study, published in 2013, used data collected by Health Workforce Pilot Project. It compared 5,812 aspiration procedures performed by physicians with 5,675 aspiration procedures performed by APRNs and PAs. The study concluded "complications were rare" among both groups of clinicians, and that complications were "clinically equivalent" between the two groups. Dr. Goodman explained that the results confirmed existing evidence from smaller studies "and from larger international and national reviews that have found [APRNs] to be safe and qualified health care providers."

**Licensure by the Board of Nursing and APRN Scope of Practice**

¶19 The Legislature has defined an APRN as "a registered professional nurse who has completed educational requirements related to the nurse's specific practice role, in addition to basic nursing education, as specified by the board pursuant to 37-8-202." Section 37-8-102(1), MCA. Section 37-8-202(2)(b), MCA, sets forth the organization, powers, and duties of the Board and, relevant to APRNs, provides:

---

[4] Women become ineligible for medication abortion past 10 weeks from the day of the patient's LMP.

11

The board may . . . define the educational requirements and other qualifications applicable to recognition of advanced practice registered nurses. Advanced practice registered nurses are nurses who must have additional professional education beyond the basic nursing degree required of a registered nurse. Additional education must be obtained in courses offered in a university setting or the equivalent. The applicant must be certified or in the process of being certified by a certifying body for advanced practice registered nurses. Advanced practice registered nurses include nurse practitioners, nurse-midwives, nurse anesthetists, and clinical nurse specialists.

¶20 A person "may practice in [a] specified field of advanced practice registered nursing upon approval by the board of an amendment to the person's license granting a certificate in a field of advanced practice registered nursing." Section 37-8-409(1), MCA. "The board shall grant a certificate in a field of advanced practice registered nursing to a person who submits written verification of certification by a board-approved national certifying body appropriate to the specific field . . . ." Section 37-8-409(1), MCA.

¶21 Section 37-8-202(2)(e), MCA, provides that the Board may "adopt rules necessary to administer" Title 37, chapter 8, MCA ("Nursing"). Pursuant to this statutory power, the Board has adopted a definition of "certifying body"[5] and adopted the requirement that APRNs "abide by the current practice standards and guidelines established by a national professional organization for the APRN's role and population focus." Admin. R. M. 24.159.1405(1)(b) (2013). "National professional organization" is defined as "a board-recognized professional nursing membership organization that delineates nursing practice standards and guidelines." Admin. R. M. 24.159.301(22) (2021). The National

_____

[5] The Board defines "certifying body," as "a board-recognized national certifying organization that uses psychometrically sound and legally defensible examinations for certification in APRN roles and population focus." Admin. R. M. 24.159.301(4) (2021).

Organization of Nurse Practitioner Faculties is one of the national professional organizations that delineates standards and guidelines for APRN-FNPs and provides educational curriculum and content that includes women's sexual and reproductive health, pregnancy, and postpartum care. The American College of Nurse Midwives (ACNM) is the Board-recognized national professional organization that delineates practice standards and guidelines for APRN-CNMs. The ACNM requires the educational curriculum for APRN-CNMs to include women's sexual and reproductive health.

¶22 These national organizations provide the curriculum, practice standards, and certifying exams which establish the baseline for licensure of APRNs, including APRN-FNPs and APRN-CNMs. However, APRNs must further "engage in ongoing competence development . . . [which] is the method by which an APRN gains, maintains, or refines practice, knowledge, skills, and abilities." Admin. R. M. 24.159.1469(1) (2021). APRNs are required to be:

> [A]ccountable to patients, the nursing profession, and to the board for complying with the rules and statutes for the quality of advanced nursing care rendered, for recognizing limits of knowledge and experience, for planning for the management of situations beyond the APRN's expertise, and for consultation with or referring patients to other health care providers as appropriate.

Admin. R. M. 24.159.1405(2) (2013). These rules provide the framework within which APRNs must exercise their professional judgment to determine if they have the expertise and background to address the health needs of any particular patient. These rules also establish APRNs are responsible for determining the training and supervision, following certification, necessary to competently perform the services they are providing.

¶23 Neither the State nor the Legislature lists health services APRNs may or may not provide. Instead, the Board's administrative regulations establish an APRN's practice, including the following:

(a) establishing medical and nursing diagnoses, treating, and managing patients with acute and chronic illnesses and diseases; and

(b) providing initial, ongoing, and comprehensive care, including:

(i) physical examinations, health assessments, and/or other screening activities;

(ii) prescribing legend and controlled substances when prescriptive authority is successfully applied for and obtained;

(iii) ordering durable medical equipment, diagnostic treatments and therapeutic modalities, laboratory imaging and diagnostic tests, and supportive services, including, but not limited to, home healthcare, hospice, and physical and occupational therapy;

(iv) receiving and interpreting results of laboratory, imaging, and/or diagnostic studies;

(v) working with clients to promote their understanding of and compliance with therapeutic regimens;

(vi) providing instruction and counseling to individuals, families, and groups in the areas of health promotion, disease prevention, and maintenance, including involving such persons in planning for their health care; and

(vii) working in collaboration with other health care providers and agencies to provide and, where appropriate, coordinate services to individuals and families.

Admin. R. M. 24.159.1406 (2013).

¶24 The Board also grants APRNs prescriptive authority after they meet certain additional educational requirements, permitting them to "prescribe, procure, administer,

14

and dispense . . . controlled substances pursuant to applicable state and federal laws and within the APRN's role and population focus." Admin. R. M. 24.159.1461(1) (2013); Admin. R. M. 24.159.1463 (2021). APRNs registered with the DEA may prescribe potentially dangerous and addictive drugs, and medications that carry far more risk than the medications used in a medication abortion. The pharmaceuticals typically used for medication abortion—mifepristone and misoprostol—are as safe as over-the-counter medications, such as Tylenol. Abortion medications are approved by the Food and Drug Administration and supported by national medical organizations.

¶25 APRNs in Montana practice autonomously within their scope of practice for which they are trained and without any legally mandated collaboration with or supervision by a physician. The relevant statutes and regulations guide APRNs in the exercise of their professional judgment. Moreover, the Board's approach to APRN regulation is consistent with other medical provider regulation designed to protect the public health. For example, physicians follow a similar self-evaluation approach for competence. Once licensed by the State, they must know the limits of their practice and may be subject to discipline if they provide care beyond their competence. The Montana Board of Medical Examiners does not maintain a list of procedures that physicians may or may not provide. The State, through the Board of Medical Examiners, requires physicians to provide care consistent with their education and training and based on guidance from their professional organizations. Physicians who deviate from these rules are subject to discipline. Similarly, APRNs who do not provide care consistent with their education, training, and guidance

from professional organizations may be disciplined by the Board. *See* § 37-8-202(1)(g), MCA ("The board shall . . . cause the prosecution of persons violating this chapter.").

¶26    In July 2019, the Board addressed the issue of abortion and APRN scope of practice. The specific question before the Board was: "Can Certified Nurse Practitioners certified in Family Practice (APRN-FNP) or Certified Nurse Midwives (APRN-CNM) provide medication and aspiration abortion services without specific authorization from the Board?" The Board unanimously concluded it would "leave the rules and statutes as they are because they adequately cover this issue." Thus, the Board determined "specific authorization" was not necessary to permit APRNs to provide abortion care. Importantly, the Board explained "[m]edication and aspiration abortion procedures are not significantly different than the procedures, medications and surgeries that nurse practitioners currently perform without significant issues."

¶27    The Board recognizes numerous national professional organizations that outline the scope and standards of practice for APRNs. Like the Board, none of these organizations provide a comprehensive or exhaustive list of health care services that APRNs are specifically authorized to provide. The American Association of Nurse Practitioners (AANP) and the ACNM define APRNs' scope of practice broadly, leaving APRNs with significant latitude to provide a range of services. The AANP, for example, instructs that "[a]s licensed, independent practitioners, . . . [APRNs] provide a wide range of health care services including the diagnosis and management of acute, chronic, and complex health problems, health promotion, disease prevention, health education, and counseling to individuals, families, groups and communities."

16

¶28 The ACNM broadly defines the scope of practice for CNMs as "encompass[ing] the independent provision of care during pregnancy, childbirth, and the postpartum period; sexual and reproductive health; gynecologic health; and family planning services, including preconception care." In 2019, the ACNM affirmed that "[m]anual vacuum aspiration abortion and medication abortion may be safely provided by trained advance practice clinicians [], including midwives."

¶29 Finally, as noted, similar skills are required for both APRN-provided services and abortion care. APRNs insert and remove intrauterine contraceptive devices (IUDs)[6] and other contraceptive implants and perform endometrial biopsies. APRNs may perform early prenatal ultrasounds, miscarriage management, and IUD insertions, and prescribe medications, among many other services that are related to and comparable to abortion care. APRNs also provide health care services that are more complex than early abortion care, including, but not limited to, neuraxial anesthesia, central line insertions, arterial line insertions, intubations, chest tube insertions, surgical first assistance, colonoscopies, and endoscopies. Managing miscarriages—which the State does not dispute is within APRNs' scope of practice—entails essentially the identical procedure and protocol as early abortion care. For instance, APRNs treating miscarriages may perform an aspiration procedure where the cervix is dilated, and a curette is used to remove the uterine contents through suction. This is essentially the same procedure required for an early-term abortion. Dr. Aultman, the State's expert, testified that managing the complications involved in

---

[6] Like aspiration abortion, inserting and removing an IUD involves placing an instrument through the cervix. Difficult removals may necessitate cervical dilation.

17

miscarriage and stillbirth—which APRNs already do in Montana—is "extremely similar to management of abortion complications."  Dr. Mulcaire-Jones, the State's other expert, likewise elaborated that the "techniques and protocols" for "tak[ing] care of women who have fetal demise or miscarriage or a stillbirth" are "identical" to those used for abortion care.[7]

¶30    Accordingly, the uncontroverted evidence established that APRN-FNPs and APRN-CNMs provide a broad range of health care within their scope of practice that is identical to, or significantly more complex, than early abortion care.  In particular, there is no dispute or genuine issue of fact that miscarriage management is within the scope of practice of APRN-FNPs and APRN-CNMs, and that the protocol, procedures, and risk of harm from complications for miscarriage management are identical to early abortion care.

¶31    The parties have both submitted that there is no dispute of material fact.

## STANDARDS OF REVIEW

¶32    We review de novo a district court's grant or denial of summary judgment, applying the same criteria of M. R. Civ. P. 56 as a district court.  *Pilgeram v. GreenPoint Mortg. Funding, Inc.*, 2013 MT 354, ¶ 9, 373 Mont. 1, 313 P.3d 839 (citation omitted).  A motion for summary judgment must be granted when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3). "When there are cross-motions for summary judgment, a district court must evaluate each party's motion on its own merits."  *Kilby Butte Colony, Inc. v. State Farm Mut. Auto. Ins.*

---

[7] Miscarriages can be managed with medication, specifically misoprostol, one of the medications used in medication abortion.

18

*Co.*, 2017 MT 246, ¶ 7, 389 Mont. 48, 403 P.3d 664. We review a district court's conclusions of law to determine whether they are correct and its findings of fact to determine whether they are clearly erroneous. *Pilgeram*, ¶ 9 (citation omitted).

¶33 The Court's review of constitutional questions is plenary. *Williams v. Bd. of County Comm'rs*, 2013 MT 243, ¶ 23, 371 Mont. 356, 308 P.3d 88. "A district court's resolution of an issue involving a question of constitutional law is a conclusion of law which we review to determine whether the conclusion is correct." *Bryan v. Yellowstone County Elementary Sch. Dist. No. 2*, 2002 MT 264, ¶ 16, 312 Mont. 257, 60 P.3d 381.

¶34 Statutes are presumed to be constitutional, and we regard that presumed constitutionality as a high burden to overcome. *Hernandez v. Bd. of County Comm'rs*, 2008 MT 251, ¶ 15, 345 Mont. 1, 189 P.3d 638 (citing *Montanans for the Responsible Use of the Sch. Tr. v. State ex rel. Bd. of Land Comm'rs*, 1999 MT 263, ¶ 11, 296 Mont. 402, 989 P.2d 800). The challenging party bears the burden of proving the statute is unconstitutional. *Molnar v. Fox*, 2013 MT 132, ¶ 49, 370 Mont. 238, 301 P.3d 824. Separately, we have also recognized that "legislation infringing the exercise of the right of privacy must be reviewed under a strict-scrutiny analysis," which necessarily shifts the burden to the State to demonstrate that the legislation is "justified by a compelling state interest and [is] narrowly tailored to effectuate only that compelling interest." *Armstrong*, ¶ 34. While the analysis of a statute pertaining to fundamental rights will generally require a strict scrutiny review that ultimately shifts the burden, we still begin our review with the same principle: statutes are presumed to be constitutional. To do otherwise would infringe on the principle of separation of powers and the deference we give to the Legislature, as it

is the Legislature's prerogative to legislate under their general police power, and not merely in those areas we do not consider fundamental.

## DISCUSSION

¶35 Independently of the federal constitution, when the right of individual privacy is implicated, Montana's Constitution affords significantly broader protection than the federal constitution. *Gryczan v. State*, 283 Mont. 433, 448, 942 P.2d 112, 121 (1997); *see also Armstrong*, ¶34 (stating that Montanans right to privacy is the "most stringent" and "exceed[s] even that provided by the federal constitution"). The delegates to Montana's 1972 Constitutional Convention viewed the textual inclusion of this right in Montana's new constitution as being necessary for the protection of the individual in "an increasingly complex society . . . [in which] our area of privacy has decreased, decreased, and decreased." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, Vol. V, p. 1681. Delegate Campbell proclaimed that the "right to be let alone" is "the most important right of them all." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, Vol. V, p. 1681. We acknowledged the expansiveness of the right of privacy in Montana's Constitution in *Armstrong*:

> [I]t is clear from their debates that the delegates intended this right of privacy to be expansive—that it should encompass more than traditional search and seizure. The right of privacy should also address information gathering and protect citizens from illegal private action and from legislation and governmental practices that interfere with the autonomy of each individual to make decisions in matters generally considered private.

*Armstrong*, ¶ 33.

20

¶36 "Few matters more directly implicate personal autonomy and individual privacy than medical judgments affecting one's bodily integrity and health." *Armstrong*, ¶ 53. The express guarantee of privacy in Article II, Section 10, is fundamental:

> [U]nder Montana's Constitution, the right of individual privacy—that is, the right of personal autonomy or the right to be let alone—is fundamental. It is, perhaps, one of the most important rights guaranteed to the citizens of this State, and its separate textual protection in our Constitution reflects Montanans' historical abhorrence and distrust of excessive governmental interference in their personal lives.

*Gryczan*, 283 Mont. at 455, 942 P.2d at 125. The Montana Constitution "guarantees each individual the right to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from government interference." *Armstrong*, ¶ 14. More specifically, Article II, Section 10, "protects a woman's right of procreative autonomy . . . [that is] to seek and obtain a specific lawful medical procedure . . . from a health care provider of her choice." *Armstrong*, ¶ 14.

¶37 In *Armstrong*, a PA challenged the constitutionality of §§ 37-20-103 and 50-20-109 (1995), MCA, which excluded PAs from performing abortions. At that time, the statutes restricted the provision of abortion to physicians, specifically barring PAs from providing abortion care. *Armstrong*, ¶¶ 21, 26. This Court held the statutes were unconstitutional because they interfered with a woman's right to obtain an abortion from a qualified health care provider[8] of her choosing. *Armstrong*, ¶ 75. Decisions about whom to trust with

---

[8] "Health care provider" refers to "any physician, physician-assistant certified, nurse, nurse-practitioner, or other professional who has been determined by the appropriate medical examining and licensing authority" to have the requisite training, education, or experience to provide the care the patient seeks. *Armstrong*, ¶ 2 n.1.

"intimate invasions of body and psyche," such as those involved in health care, must be the individual's decision, and state regulation must be based on protecting citizens from actual health risks. *Armstrong*, ¶¶ 58-59. Limiting access to abortion care by reducing the number of qualified providers only makes obtaining abortion care "as difficult, as inconvenient and as costly as possible" under the guise of "protecting women's health." *Armstrong*, ¶ 65. *Armstrong* unequivocally established that a woman has a fundamental right of privacy to seek abortion care from a qualified health care provider of her choosing, absent clear demonstration by the State of a "medically-acknowledged, [bona fide] health risk." *Armstrong*, ¶ 62.

¶38 However, every restriction on medical care does not necessarily impermissibly infringe on the right to privacy. The State possesses a general and inherent "police power by which it can regulate for the health and safety of its citizens." *Wiser v. State*, 2006 MT 20, ¶ 19, 331 Mont. 28, 129 P.3d 133. To protect "the health of its citizens," the State may regulate and license health care professionals. *Wiser*, ¶ 18. Thus, Montanans do not possess an unqualified right to obtain medical care free of State regulation. The Montana Constitution does not encompass a "fundamental right to seek medical care from unlicensed professionals." *Wiser*, ¶ 18. We have explained that the State and its licensing boards determine who is qualified to provide medical services. *Wiser*, ¶ 17. Thus, the right of privacy to make health care choices guarantees access to a health care provider who has been determined "competent" by the medical community and "licensed" to perform the service. *Wiser*, ¶ 16 (citing *Armstrong*, ¶ 62). "[T]he practice of medicine is a privilege, not a right, in Montana and . . . it is generally subject to legislative oversight in order to

22

protect the health, safety, and welfare of the people of Montana." *Armstrong*, ¶ 79 (Gray, J., specially concurring).

¶39 We similarly recognized a circumscription of the right of privacy in *Montana Cannabis Industry Ass'n v. State*, 2012 MT 201, 366 Mont. 224, 286 P.3d 1161 (*MCIA*). *MCIA* addressed the Montana Marijuana Act, which limited Montanans' right to access medical marijuana. *MCIA*, ¶ 4. We explained that the right of privacy is implicated when a statute infringes upon a person's ability to obtain or reject medical treatment that is *lawful*, but that it does not follow that the right is implicated when a statute regulates a particular medication. *MCIA*, ¶ 27. The fundamental right of privacy does not include an "affirmative right of access to medical marijuana" because the right of privacy does not extend to give a patient the right to use any particular medication. *MCIA*, ¶ 32.

¶40 We have recognized "the State of Montana has a police power by which it can regulate for the health and safety of its citizens." *Wiser*, ¶ 19. The Legislature retains its police power when it creates agencies and boards and delegates power to them. When the Legislature creates these boards, it implicitly, and sometimes explicitly, recognizes the expertise that those appointed to positions on the board provide. As can be seen through history and practice, the Legislature often leaves board decisions untouched, respecting the expertise of the individuals on the board and affording the board deference to operate, so long as it operates within its statutory parameters—parameters set by the Legislature and subject to the Legislature's alterations. In *Wiser*, the Legislature dissolved the Board of Denturitry and placed the regulation of denturists under the Board of Dentistry. *Wiser*, ¶ 8. While focusing on the denturists' federal and state constitutional arguments, including

23

privacy, we implicitly recognized the inherent power retained by the Legislature over the boards it statutorily creates. *Wiser*, ¶ 24. Thus, the Legislature does not lose its authority to legislate in areas that have been delegated to the oversight of a board. The Legislature's power to protect the "health, safety, and welfare of the people of Montana" remains. *Armstrong*, ¶ 79 (Gray, J., specially concurring).

¶41 The District Court began its analysis by essentially holding the Legislature had no proper role in the discussion about the issue before us, stating the Legislature has no right to "substitute[] its own judgment on the medical qualifications of APRNs in place of the Board's general authority on the issue" absent an articulated "clear reason determining the Board is incompetent to regulate its licensees regarding the practice of abortion." In doing so, the District Court determined that the Legislature has no place at the table. This was incorrect. The State has a police power by which it can regulate for the health and safety of its citizens. The question is not whether the Legislature has authority to act, but rather whether the Legislature's action is constitutional.

¶42 Here, the State argues there are no fundamental rights at issue, and specifically, the right of privacy is not implicated because the decision to seek and obtain an abortion is not at issue. The State argues § 50-20-109(1)(a), MCA, merely regulates who can provide a surgical procedure that has "known risks to human health and wellbeing." The State maintains that because the statute does not implicate the decision to seek and obtain an abortion but, instead, implicates the State's authority to protect public health and safety, rational basis review should be applied to assess its constitutionality. We easily conclude that ship has already sailed.

24

¶43     The restriction in § 50-20-109(1)(a), MCA, is virtually identical to the restriction in *Armstrong* which also precluded qualified health care providers from performing abortion care.   In *Armstrong* and *Weems I*, this Court recognized that the Montana Constitution guarantees a fundamental right to access abortion care from a qualified health care provider of a woman's choice.  *Armstrong*, ¶ 75; *Weems I*, ¶ 26.  Weems claims the restriction in § 50-20-109(1)(a), MCA, interferes with that right by making it a crime for qualified clinicians who are not physicians or PAs to provide abortion care.   We now have the benefit of a fully developed record and the District Court's conclusion that § 50-20-109(1)(a), MCA, interferes with a woman's right of privacy and her decision to obtain lawful healthcare from a qualified provider of her choice.  The District Court held that  § 50-20-109(1)(a), MCA, implicates a patient's fundamental right of privacy because it removes qualified APRNs from the pool of health care providers from which women may choose to obtain lawful medical procedures, thus implicating a patient's fundamental right of privacy.  Accordingly, we review § 50-20-109(1)(a), MCA, under strict scrutiny.

¶44     Since § 50-20-109(1)(a), MCA, interferes with a fundamental right, the State has the burden to demonstrate a compelling interest justifying the intrusion and the intrusion is narrowly tailored to advance only that interest.  *Armstrong*, ¶ 34.  To rise to the level of "compelling," a state interest must be "at a minimum, some interest of the highest order and . . . not otherwise served."  *Armstrong*, ¶ 41 n.6 (internal quotation marks omitted; citation omitted).  A narrowly tailored law is "the least onerous path that can be taken to achieve the state objective."  *Wadsworth v. State*, 275 Mont. 287, 302, 911 P.2d 1165, 1174 (1996).

¶45     Here, within the framework of *Armstrong*, the State's burden is to show there is a "medically-acknowledged, [bona fide] health risk, clearly and convincingly demonstrated," justifying interference with a woman's access to abortion and her choice of a health care provider. *Armstrong*, ¶ 62. To determine whether the State has met its burden, we analyze the record and consider whether the State provided a meritorious argument that when APRNS perform abortions, there are exacerbated health risks not present when physicians or PAs perform abortions.

¶46     The record is devoid of any evidence that APRNs providing abortion care present a medically acknowledged, bona fide health risk to Montana women. The State's argument is detached from the overwhelming evidence presented to the District Court that abortion care is one of the safest forms of medical care in this country and the world, and that APRNs are qualified providers. The State's reasoning rests on a faulty foundation: it puts aspiration abortions in the category of "surgery" because "instruments" are used to remove "human tissue"; because an aspiration abortion is "surgery" it has all the attendant risks of surgery—hemorrhaging, infection, post-operative care, and monitoring; because abortion is "surgery" it should not be treated any differently than other elective surgery, which occurs in a clinic or hospital; because it is surgery it is not safe unless done where emergency backup is in place and where clinicians who can perform "surgery" are present. This reasoning would exclude APRNs from performing abortion care because, as the State posits, post-abortion care might be beyond what APRNs are capable of handling or authorized to do. Finally, at oral argument, the State represented that APRNs also should not perform medication abortions because complications from a medication abortion could

26

lead to surgery. Therefore, according to the State, APRNs would not be authorized to dispense mifepristone or misoprostol.

¶47 It is an undisputed fact in these proceedings, accepted by all the parties, that the protocols, procedures, and the attendant complications of abortion care are identical to miscarriage care. The State argues that, while APRNs may be able to perform the abortion procedure, they are not capable or qualified to handle the "unacceptable" risk of *complications* arising from an abortion. However, the same risk of complications exists in miscarriage care, which the State has not argued presents a threat to public health and safety when performed by APRNs. Thus, the State's argument logically must fail. The State's ability to restrict the pool of health care providers and, concomitantly, a woman's choice of who provides her health care, must be tethered to a medically acknowledged, bona fide health risk associated with those providers. Based on a straightforward, uncomplicated review of the evidentiary record, there is no medically recognized bona fide health risk for APRNs to perform abortion care, much less one that is clearly and convincingly demonstrated.

¶48 The overwhelming evidence amassed in the District Court record established that abortion care is one of the safest procedures in this country and the world. Complication rates from abortion are similar to or lower than other outpatient procedures. When complications do occur, they are usually minor and easily treatable—normally at home or in an outpatient setting. Abortions remain one of the safest procedures when performed collectively by health care providers, including APRNs. Other APRN-provided services require similar skills to those required in early abortion care, including the insertion and

27

removal of IUDs and other contraceptive implants, and performing endometrial biopsies. The Board agreed, noting that medication and aspiration abortion care "are not significantly different than the procedures, medications and surgeries that nurse practitioners currently perform without significant issues." National and international studies establish there is no difference in the prevalence of complications when an APRN performs an abortion and when a physician or PA performs an abortion. The record shows that the health care community and the national professional nursing organizations recognize APRNs as competent and safe abortion care providers.

¶49 The record also demonstrates that APRNs already competently provide health services that are more complex than early abortion care. For instance, APRNs currently provide health care services such as neuraxial anesthesia, central line insertions, and intubations. Additionally, ARPNs can prescribe dangerous and addictive medications that carry more risks than mifepristone and misoprostol, which are as safe as other over-the-counter medications.

¶50 Moreover, limiting the pool of qualified abortion providers would significantly interfere with a patient's right of privacy because of significant cost and travel required to access a provider. The scarcity of providers in Montana increases the likelihood patients will experience delays accessing care, forcing them to remain pregnant until they can seek a later-term abortion, which can result in comparatively higher risk, greater expenses, and even ineligibility for medication abortion as pregnancy advances. Access to abortion care in Montana is the difference between obtaining quality care or no care at all, especially for patients who might otherwise "time out" of early abortion care because their pregnancy

extended past a certain gestational age, which can result in safety repercussions for the patient.

## CONCLUSION

¶51 Article II, Section 10, of the Montana Constitution guarantees a woman a fundamental right of privacy to seek abortion care from a qualified health care provider of her choosing, absent a clear demonstration of a medically acknowledged, bona fide health risk. The State has failed to meet its burden of demonstrating that APRN-FNPs and APRN-CNMs providing abortion care present a medically acknowledged, bona fide health risk. The State has failed to present any evidence that demonstrates abortions performed by APRNs include more risk than those provided by physicians or PAs. The State has failed to identify any reason why APRNs should be restricted from providing abortions, and thus failed to articulate a medically acknowledged, bona fide health risk. The District Court correctly determined that no genuine dispute of material fact exists regarding the safety and efficacy of APRNs providing early abortion care. Accordingly, § 50-20-109(1)(a), MCA, is an unconstitutional interference with a woman's right of privacy to seek medical care from a qualified provider of her choice.

¶52 The District Court's Order on Motions for Summary Judgment granting judgment to Weems is affirmed.

/S/ LAURIE McKINNON

29

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE