FILED

08/14/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0272

DA 23-0272

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 178

PLANNED PARENTHOOD OF MONTANA
and SAMUEL DICKMAN, M.D., on
behalf of themselves and their patients,

　　　　Plaintiffs and Appellees,

　　v.

STATE OF MONTANA and AUSTIN KNUDSEN,
Attorney General of the State of Montana, in his
official capacity, and his agents and successors,

　　　　Defendants and Appellants.

APPEAL FROM:　　District Court of the First Judicial District,
　　　　　　　　　In and For the County of Lewis and Clark, Cause No. DDV-2013-407
　　　　　　　　　Honorable Christopher D. Abbott, Presiding Judge

COUNSEL OF RECORD:

　　　　For Appellants:

　　　　　　　　Austin Knudsen, Montana Attorney General, Brent Mead (argued), Deputy
　　　　　　　　Solicitor General, Michael D. Russell, Michael Noonan, Thane Johnson,
　　　　　　　　Assistant Attorneys General, Helena, Montana

　　　　　　　　Emily Jones, Special Assistant Attorney General, Jones Law Firm, Billings,
　　　　　　　　Montana

　　　　　　　　Dale Schowengerdt, Landmark Law, PLLC, Helena, Montana

　　　　For Appellees:

　　　　　　　　Tanis M. Holm (argued), Colton Holm, PLLC, Billings, Montana

　　　　　　　　Anjali Salvador, Kyla Eastling, Planned Parenthood Federation of America,
　　　　　　　　New York, New York

　　　　For Amicus Montana Family Foundation:

　　　　　　　　Derek J. Oestreicher, Montana Family Foundation, Laurel, Montana

For Amicus National Center for Youth Law:

Rylee Sommers-Flanagan, Dimitrios Tsolakidis, Mikaela Koski, Upper Seven Law, Helena, Montana

For Amici Forward Montana, If/When/How, and Indigenous Women Rising:

Caitlin Boland Aarab, Boland Aarab, Great Falls, Montana

Jessica S. Goldberg, If/When/How, Oakland, California

For Amici American College of Obstetricians and Gynecologists, American Medical Association, Montana Medical Association, Society for Maternal-Fetal Medicine, and Society of Family Planning:

Katherine S. Huso, Matovich, Keller & Huso, P.C., Billings, Montana

Nicole A. Saharsky, Mayer Brown LLP, Washington, District of Columbia

Argued and Submitted : March 6, 2024

Decided: August 14, 2024

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 This appeal requires the Court to consider Planned Parenthood's challenge under the Montana Constitution to a state statute, the Parental Consent for Abortion Act of 2013 (Consent Act), now codified at §§ 50-20-501-11, MCA.[1] The Consent Act conditions a minor's right to obtain an abortion on parental consent unless a judicial waiver is obtained. It imposes no corresponding limitation on a minor who seeks medical or surgical care otherwise related to her pregnancy or her child. We decide today that the classification created by the Legislature violates the fundamental right of a minor to control her body and destiny as guaranteed by Article II, Section 10, of the Montana Constitution, *Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, and *Weems v. State*, 2023 MT 82, 412 Mont. 132, 529 P.3d 798, without adequate justification from the State. The Consent Act, therefore, cannot be sustained against Plaintiffs' privacy and equal protection challenges. Because a minor's right to control her reproductive decisions is among the most fundamental of the rights she possesses, and because the State has failed to demonstrate a real and significant relationship between the statutory classification and the ends asserted, we hold that the Consent Act violates the Constitution of the State of Montana.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In 1999, a district court issued an opinion and order in the First Judicial District, Lewis and Clark County, holding that the Parental Notice of Abortion Act of 1995 unconstitutionally violated a minor's right to privacy and equal protection of the law.

---

[1] The caption has been changed to reflect the current parties in this appeal.

*Wicklund v. State*, No. ADV 97-671, 1999 Mont. Dist. LEXIS 1116 (1st Jud. Dist. Feb. 11, 1999). The State chose not to appeal the court's decision.

¶3    In January 2013, the Parental Notice of Abortion Act of 2011 (Notice Act) became law following voter approval of Legislative Referendum 120 from the previous November. The Notice Act repealed the earlier 1995 law. The Legislature, however, enacted the Consent Act with an effective date of July 1, 2013, which repealed the Notice Act. Before the effective date of the Consent Act, these proceedings were initiated. Because the Attorney General consented to issuance of a preliminary injunction against the Consent Act, the law it repealed—the Notice Act—remained in effect. This case does not concern the Notice Act, which is currently being challenged in the District Court on constitutional grounds.

¶4    On January 31, 2014, the District Court issued an opinion and order in these proceedings holding that because the State did not appeal the 1999 *Wicklund* decision, the State was collaterally estopped from defending the Notice and Consent Acts. On appeal, however, this Court concluded that issue preclusion did not prevent the State from defending the Consent and Notice Acts, because the laws were different from prior laws. *Planned Parenthood v. State*, 2015 MT 31, 378 Mont. 151, 342 P.3d 684. The matter was thus remanded for the court to determine the merits of the challenges. Due to a lengthy series of judicial substitutions, recusals, and retirements, the matter was not decided until February 2023.

¶5    Cross-motions for summary judgment were filed by Planned Parenthood and the State contending that there were no genuine disputes of material fact that needed to be

4

resolved at trial, and that each was entitled to judgment as a matter of law. In a comprehensive, fifty-page opinion and order, the District Court entered summary judgment in favor of Planned Parenthood, concluding the Consent Act violated the Montana Constitution. After considering the evidence, it held there were no genuine disputes of material fact and determined that the Consent Act infringes on the right of privacy guaranteed in Article II, Section 10, of the Montana Constitution, and defined in *Armstrong*. The court held the Consent Act was not narrowly tailored to achieve the State's compelling interests, which the State identified as: (1) protecting minors from sexual offenses; (2) monitoring post-abortion and mental health trauma; (3) ensuring minors engage in fully informed decision-making; and (4) promoting parental rights. The court did not address Planned Parenthood's equal protection challenge. Regarding the Notice Act, the court determined that, while serving the same ends as the Consent Act, the "mechanics" of the Notice Act "are starkly different and much less onerous." The court determined there were factual questions in dispute regarding the Notice Act which were not amenable to resolution on summary judgment. The District Court thereafter determined to certify to this Court its decision relative to the Consent Act pursuant to Mont. R. Civ. P. 54(b). On May 30, 2023, this Court entered an order allowing the appeal to proceed and held oral argument on March 6, 2024.[2]

---

[2] The District Court did grant the State's motion for summary judgment with respect to one of Planned Parenthood's claims regarding the Notice Act: that the Notice Act violates the due process rights of physicians and staff because it imposes absolute liability for violations of their requirements without providing sufficient clarity as to what conduct is prohibited or required. However, that issue was not certified under Mont. R. Civ. P. 54(b).

¶6     The Consent Act conditions a minor's right to obtain an abortion on parental consent unless a judicial waiver is obtained. The legislative findings provide the underlying rationale for the Consent Act:

(1) The legislature finds that:

(a)     immature minors often lack the ability to make fully informed choices that take into account both immediate and long-range consequences;
(b)     the medical, emotional, and psychological consequences of abortion are sometimes serious and can be lasting, particularly when the patient is immature;
(c)     capacity to become pregnant and the capacity for mature judgment concerning the wisdom of an abortion are not necessarily related;
(d)     parents ordinarily possess information essential to a physician in the exercise of the physician's best medical judgment concerning the minor;
(e)     parents who are aware that their minor daughter has had an abortion may better ensure that the daughter receives adequate medical care after the abortion; and
(f)     parental consultation is usually desirable and in the best interests of the minor.

Section 50-20-502(1), MCA.

The legislative "purpose" of this part is to "further the important and compelling state interests" of:

(a) protecting minors against their own immaturity;
(b) fostering family unity and preserving the family as a viable social unit;
(c) protecting the constitutional rights of parents to rear children who are members of their household; and
(d) reducing teenage pregnancy and unnecessary abortion.

Section 50-20-502(2), MCA.

¶7     Towards these ends, the Consent Act prevents a physician or physician assistant from performing an abortion on a minor unless the physician or physician assistant first

6

obtains notarized written consent of a parent or legal guardian of the minor.[3]  Section 50-20-504(1), MCA.  The consent of a parent is invalid unless it is obtained in the manner and on the form prescribed by § 50-20-505, MCA.  Section 50-20-504(2), MCA.  Section 50-20-505, MCA, requires that the Department of Health and Human Services create a consent form to be used by the medical provider in obtaining the consent or waiver of the consent by a parent or legal guardian.  The form must disclose the rights of the parent or legal guardian; the surgical or medical procedures that may be performed on the minor; and the risks and hazards associated with the procedure planned for the minor.  The disclosures that must be made to the minor and parent include:

(i) any surgical, medical, or diagnostic procedure, including the potential for infection, blood clots in veins and lungs, hemorrhage, and allergic reactions;

(ii) a surgical abortion, including hemorrhage, uterine perforation or other damage to the uterus, sterility, injury to bowel or bladder, a potential hysterectomy caused by a complication or injury during the procedure, and the possibility of additional procedures being required because of failure to remove all products of conception;

(iii) a medical or nonsurgical abortion, including hemorrhage, sterility, the continuation of the pregnancy, and the possibility of additional procedures being required because of failure to remove all products of conception; and

(iv) the particular procedure that is planned for the minor, including cramping of the uterus, pelvic pain, infection of the female reproductive organs, cervical laceration, incompetent cervix, and the requirement of emergency treatment for any complications.

---

[3] Since enactment of the Consent Act in 2013, this Court decided *Weems* which expanded the scope of medical providers who could perform abortions beyond physicians and physician assistants.  However, for purposes of accuracy, this Court will use the actual language contained in the 2013 Consent Act.

7

Section 50-20-505(2)(d)(i)-(iv), MCA. These disclosures must be made to the minor regardless of whether a medication or surgical abortion is performed.

¶8 The form must include a minor consent statement that the minor must sign which includes the following statements, each of which must be initialed by the minor:

> (i) the minor understands that the physician or physician assistant is going to perform an abortion on the minor and that the abortion will end the minor's pregnancy;
> (ii) the minor is not being coerced into having an abortion, the minor has the choice not to have the abortion, and the minor may withdraw consent at any time prior to the abortion;
> (iii) the minor consents to the procedure;
> (iv) the minor understands the risks and hazards associated with the surgical or medical procedures planned for the minor;
> (v) the minor has been provided the opportunity to ask questions about the pregnancy, alternative forms of treatment, the risk of nontreatment, the procedures to be used, and the risks and hazards involved; and
> (vi) the minor has sufficient information to give informed consent.

Section 50-20-505(3)(a)(i)-(vi), MCA.

¶9 The consent form must also include a parental consent statement that a parent or legal guardian must sign which includes the following statements, each of which must be initialed by the parent or legal guardian:

> (i) the parent or legal guardian understands that the physician or physician assistant who signed the physician declaration statement . . . is going to perform an abortion on the minor that will end the minor's pregnancy;
> (ii) the parent or legal guardian had the opportunity to read the consent form or had the opportunity to have the consent form read to the parent or legal guardian;
> (iii) the parent or legal guardian had the opportunity to ask questions of the physician or physician assistant or the agent of the physician or physician assistant regarding the information contained in the consent form and the surgical and medical procedures to be performed on the minor;
> (iv) the parent or legal guardian has been provided sufficient information to give informed consent.

Section 50-20-505(3)(b)(i)-(iv), MCA.

¶10 The consent form must include a physician declaration that the physician or physician assistant is required to sign, declaring that:

> (i) the physician or physician assistant or the agent of the physician or physician assistant explained the procedure and contents of the consent form to the minor and a parent or legal guardian of the minor and answered any questions; and
> (ii) to the best of the physician's or physician assistant's knowledge, the minor and a parent or legal guardian of the minor have been adequately informed and have consented to the abortion.

Section 50-20-505(c)(i)-(ii), MCA.

¶11 The signature page of the consent form must be notarized, and it must include "an acknowledgment by the parent or legal guardian affirming that the parent or legal guardian is the minor's parent or legal guardian." Section 50-20-505(3)(d), MCA. A parent or legal guardian must provide "government-issued proof of identity and written documentation that establishes that the parent or legal guardian is the lawful parent or legal guardian of the minor." Section 50-20-506(1), MCA. A physician or physician assistant must "retain the completed consent form and [accompanying documents] in the minor's medical file for 5 years after the minor reaches 18 years of age, but in no event less than 7 years." Section 50-20-506(2), MCA. "A physician or physician assistant receiving documentation under this section shall execute for inclusion in the minor's medical record an affidavit stating: 'I, (insert name of physician or physician assistant), certify that according to my best information and belief, a reasonable person under similar circumstances would rely on the information presented by both the minor and the minor's parent or legal guardian as sufficient evidence of identity and relationship.'" Section 50-20-506(3), MCA.

9

¶12 Consent may be waived if the provider certifies in the minor's medical record that a medical emergency exists and there is insufficient time to provide consent, or it may be waived by a parent in a notarized writing. Section 50-20-507, MCA. The Consent Act provides that any person performing an abortion without notarized parental consent that complies with the disclosure requirements in § 50-20-504, MCA, or that does not comply with the form issued by the Department of Health and Human Services, "shall be fined an amount not to exceed $1,000 or be imprisoned in the county jail for a term not to exceed 1 year, or both." Section 50-20-510(1), MCA. "On a second or subsequent conviction, the person shall be fined an amount not less than $500 or more than $50,000 and be imprisoned in the state prison for a term of not less than 10 days or more than 5 years, or both." Section 50-20-510(1), MCA. Further, the failure to obtain the required consent "is prima facie evidence in an appropriate civil action for a violation of a professional obligation." Section 50-20-510(2), MCA.

¶13 The Consent Act also contains what is colloquially referred to as a judicial bypass procedure. Section 50-20-509, MCA. An unemancipated minor may petition the youth court for a waiver of parental consent. The court must appoint counsel for the minor and may additionally appoint a guardian ad litem. The minor must demonstrate that she is competent to decide whether to have an abortion and that there is evidence of either (1) physical abuse, sexual abuse, or emotional abuse of the minor by one or both parents or legal guardian; or (2) it is not in the minor's best interests to have parental consent. A minor receiving an adverse ruling may appeal to this Court.

## STANDARD OF REVIEW

¶14 This Court "review[s] an entry of summary judgment de novo." *McClue v. Safeco Ins. Co.*, 2015 MT 222, ¶ 8, 380 Mont. 204, 354 P.3d 604 (citing *Albert v. City of Billings*, 2012 MT 159, ¶ 15, 365 Mont. 454, 282 P.3d 704). "Summary judgment is appropriate when the moving party demonstrates both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law." *Albert*, ¶ 15; M. R. Civ. P. 56(c)(3). De novo review requires this Court to determine whether a district court's conclusions of law are correct and its findings of fact are not clearly erroneous. *Pilgeram v. GreenPoint Mortg. Funding, Inc.*, 2013 MT 354, ¶ 9, 373 Mont. 1, 313 P.3d 839.

¶15 "This Court's review of constitutional questions is plenary." *Williams v. Bd. of County Comm'rs*, 2013 MT 243, ¶ 23, 371 Mont. 356, 308 P.3d 88. "A district court's resolution of an issue involving a question of constitutional law is a conclusion of law which we review to determine whether the conclusion is correct." *Bryan v. Yellowstone County Elem. Sch. Dist. No. 2*, 2002 MT 264, ¶ 16, 312 Mont. 257, 60 P.3d 381.

¶16 Statutes are presumed to be constitutional, and we regard that presumed constitutionality as a high burden to overcome. *Hernandez v. Bd. of County Comm'rs*, 2008 MT 251, ¶ 15, 345 Mont. 1, 189 P.3d 638 (citing *Montanans for the Responsible Use of the Sch. Tr. v. State ex rel. Bd. of Land Comm'rs*, 1999 MT 263, ¶ 11, 296 Mont. 402, 989 P.2d 800). The challenging party bears the burden of proving the statute is unconstitutional. *Molnar v. Fox*, 2013 MT 132, ¶ 49, 370 Mont. 238, 301 P.3d 824. "Separately, we have also recognized that 'legislation infringing the exercise of the right of privacy must be reviewed under a strict-scrutiny analysis,' which necessarily shifts the

11

burden to the State to demonstrate that the legislation is 'justified by a compelling state interest and [is] narrowly tailored to effectuate only that compelling interest.'" *Weems*, ¶ 34, quoting *Armstrong*, ¶ 34. "While the analysis of a statute pertaining to fundamental rights will generally require a strict scrutiny review that ultimately shifts the burden, we still begin our review with the same principle: statutes are presumed to be constitutional." *Weems*, ¶ 34.

## DISCUSSION

¶17 The State argues that the Consent Act furthers the State's interest in protecting minors from sexual victimization by adult men, enhancing minors' psychological and physical wellbeing by having informed parents who can monitor post-abortion complications and provide helpful medical history, and protecting minors from rash or poorly reasoned decisions that often result from a minor's underdeveloped decision-making capacity. The State also argues that Parents have a fundamental right to direct the care, custody, and control of their children. The State maintains that the Consent Act's judicial bypass provision adequately respects a minor's right of privacy and access to abortion.

¶18 Planned Parenthood maintains the Consent Act violates both the equal protection and right of privacy clauses of the Montana Constitution. First, noting that the State did not mention *Armstrong* or *Weems* in its opening brief, Planned Parenthood argues that this Court has recognized in those decisions that every Montanan has a fundamental right of privacy to seek abortion care from a qualified health care provider of her choosing, absent clear demonstration by the State of a medically acknowledged, bona fide health risk.

12

Planned Parenthood further argues that the Consent Act creates two classes of minors—those who seek abortions and those who choose to carry their pregnancies to term. Because the Consent Act infringes upon a minor's fundamental right to access abortion and the State has not met its burden of demonstrating the Consent Act is narrowly tailored to meet one or more of its compelling state interests, Planned Parenthood maintains the Consent Act is an unconstitutional infringement of a minor's rights of privacy and equal protection.

¶19 Resolving this dispute requires us to consider three constitutional provisions: (1) the Rights of Persons Not Adults; (2) the Right of Privacy; and (3) the Equal Protection Clause. Montana's Constitution affords significantly broader protections than the federal constitution. *Weems*, ¶ 35 (citing *Gryczan v. State*, 283 Mont. 433, 448, 942 P.2d 112, 121 (1997)). Two of the broader protections not found in the federal constitution implicated here are the minors' rights provision and the right of privacy. We address first the minors' rights provision and right of privacy and then turn to the equal protection clause.

### A.      Rights of Persons Not Adults.

¶20 These proceedings involve the rights of minors. The United States Supreme Court has explained:

> Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights.

*Planned Parenthood v. Danforth*, 428 U.S. 52, 74, 96 S. Ct. 2831, 2843 (1976). Montana provides minors added assurance that they possess the same constitutional rights as adults through our constitutional provision that specifically establishes minors possess the same constitutional rights as adults. Further, that provision is contained within Article II—

13

Montana's Declaration of Rights, a position within Montana's constitutional framework that establishes those rights Montana holds are fundamental.

¶21 Article II, Section 15, of the Montana Constitution, entitled Rights of Persons Not Adults, states:

> The rights of persons under 18 years of age shall include, but not be limited to, all the fundamental rights of this Article unless specifically precluded by laws which enhance the protection of such persons.

Thus, "[i]n contrast to the federal constitution, the Montana Constitution specifically compares the rights of children with those of adults . . . [and] recognizes that the State's interest in protecting children may conflict with their fundamental rights." *In re C.H.*, 210 Mont. 184, 202, 683 P.2d 931, 940 (1984). We observed in *In re C.H.*, that the comments to the Bill of Rights Committee indicate an "intent to extend fundamental rights to children and to afford constitutional protection to those rights with that one exception." *In re C.H.*, 210 Mont. at 202, 683 P.2d at 940. The comments provide:

> The committee adopted, with one dissenting vote, this statement explicitly recognizing that persons under the age of majority have all the fundamental rights of the Declaration of Rights. The only exceptions permitted to this recognition are in cases in which rights are infringed by laws designed and operating to enhance the protection for such persons. The committee took this action of recognition of the fact that young people have not been held to possess basic civil rights. Although it has been held that they are 'persons' under the due process clause of the Fourteenth Amendment, the Supreme Court has not ruled in their favor under the equal protection clause of that same amendment. What this means is that persons under the age of majority have been accorded certain specific rights which are felt to be a part of due process. However, the broad outline of the kinds of rights young people possess does not yet exist. *This is the crux of the committee proposal: To recognize that persons under the age of majority have the same protections from governmental and majoritarian abuses as do adults. In such cases where the protection of the special status of minors demands it, exceptions can be made on clear showing that such protection is being enhanced.*

*In re C.H.*, 210 Mont. at 202-03, 683 P.2d at 940 (quoting Committee Report, Vol. II, 634-36 (1971-72) (emphasis added)). We have, therefore, held that pursuant to Article II, Section 15, "minors are afforded full recognition under the equal protection clause and enjoy all the fundamental rights of an adult under Article II." *In re S.L.M.*, 287 Mont. 23, 35, 951 P.2d 1365, 1373 (1997). *See In re J.W.*, 2021 MT 291, ¶ 23, 406 Mont. 224, 498 P.3d 211 ("Montana youths are constitutionally guaranteed the same fundamental rights as adults."). We have explained that "if the legislature seeks to carve exceptions to this guarantee, it must not only show a compelling state interest but must also show that the exception is designed to enhance the rights of minors." *S.L.M.*, 287 Mont. at 35, 951 P.2d at 1373. We clarify today, however, that minors do not have *more* or *enhanced rights* in comparison to adults; rather, Article II, Section 15 provides that minors have the *same* fundamental rights as adults under Article II, which may be infringed only when the State can clearly show a compelling state interest "which enhance[s] the *protection* of such persons." Article II, Section 15 (emphasis added). In *S.L.M.*, we stated that the legislature must not only show a compelling state interest "but must also show that the exception is designed to enhance the rights of minors." *S.L.M.*, 287 Mont. at 35, 951 P.2d at 1373. This was incorrect because the demonstration that is required is the enhancement of the *protections* provided minors, not *rights*. We therefore repudiate our statement without otherwise disturbing the holding in *S.L.M.* Thus, as explained by the Bill of Rights Committee, "persons under the age of majority have all the fundamental rights of the Declaration of Rights. The only exceptions permitted to [t]his recognition are in cases in

15

which rights are infringed by laws designed and operating to enhance the protection for such persons." *In re C.H.*, 210 Mont. at 202, 683 P.2d at 940 (quoting Committee Report, Vo. II, 634-36). That, in turn, requires a "clear showing that such protection is being enhanced." *In re C.H.*, 210 Mont. at 203, 683 P.2d at 940.

### B. A Minor's Right to Privacy.

¶22 The right of privacy is explicitly guaranteed in Montana's Constitution and is a fundamental right. Article II, Section 10, of the Montana Constitution provides:

> Right of Privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

In both *Armstrong* and *Weems*, we acknowledged the expansiveness of the right of privacy in Montana's Constitution:

> [I]t is clear from their debates that the delegates intended this right of privacy to be expansive—that it should encompass more than traditional search and seizure. The right of privacy should also address information gathering and protect citizens from illegal private action and from legislation and governmental practices that interfere with the autonomy of each individual to make decisions in matters generally considered private.

*Weems*, ¶ 35; *Armstrong*, ¶ 33. "[U]nder Montana's Constitution, the right of individual privacy—that is, the right of personal autonomy or the right to be let alone—is fundamental." *Gryczan*, 283 Mont. at 455, 942 P.2d at 125; *Weems*, ¶ 36. "It is, perhaps, one of the most important rights guaranteed to the citizens of this State, and its separate textual protection in our Constitution reflects Montanans' historical abhorrence and distrust of excessive governmental interference in their personal lives." *Gryczan*, 283 Mont. at 455, 942 P.2d at 125; *Weems*, ¶ 36. The Montana Constitution guarantees each individual

16

the right to make medical judgments affecting her or his bodily integrity and health, in partnership with a chosen health care provider free from governmental interference. The right of privacy contained in the Montana Constitution protects a woman's right to procreative autonomy. *Weems*, ¶ 36; *Armstrong*, ¶ 14. "Decisions about whom to trust with 'intimate invasions of body and psyche,' such as those involved in health care, must be the individual's decision, and state regulation must be based on protecting citizens from actual health risks." *Weems*, ¶ 37 (citing *Armstrong*, ¶¶ 58-59).

¶23    Not every restriction on the provision of medical care impermissibly infringes on the right to privacy. We have explained that the right of privacy to make health care choices guarantees access to a health care provider who has been determined competent by the medical community and licensed to perform the service. *Wiser v. State*, 2006 MT 20, ¶ 16, 331 Mont. 28, 129 P.3d 133. Similarly, we explained in *Montana Cannabis Industry Ass'n v. State*, 2012 MT 201, 366 Mont. 224, 286 P.3d 1161 (*MCIA*), that the right of privacy does not include an affirmative right of access under "the new medical marijuana framework" because plaintiffs, there, could not "seriously contend that they have a fundamental right to medical marijuana when it is still unequivocally illegal under the Controlled Substances Act." *MCIA*, ¶ 32.

¶24    We conclude that minors, like adults, have a fundamental right to privacy, which includes procreative autonomy and making medical decisions affecting his or her bodily integrity and health in partnership with a chosen health care provider free from governmental interest. *Weems*, ¶ 36, *Armstrong*, ¶ 14. Decisions about "intimate invasions of body and psyche" must be an individual's decision, in this case, a minor's decision.

17

*Weems*, ¶ 37, *Armstrong*, ¶¶ 58-59. The Consent Act infringes upon a minor's fundamental right to privacy because it conditions a minor's obtaining an abortion on parental consent or obtaining a judicial waiver, something a minor choosing to carry her pregnancy to term would not have to do.

¶25 Since the right of privacy is explicit in the Declaration of Rights, it is a fundamental right. For this reason, legislation infringing the exercise of the right of privacy must be reviewed under a strict scrutiny analysis; that is, "the legislation must be justified by a compelling state interest and must be narrowly tailored to effectuate only that compelling interest." *Armstrong*, ¶ 34; *Gryczan*, 283 Mont. at 449, 942 P.2d at 122. Applying strict scrutiny necessarily requires that the burden shift to the State to demonstrate, first, that the legislation is justified by a compelling state interest. *Weems*, ¶ 34. Second, the State must demonstrate that the legislation is narrowly tailored to effectuate only that compelling interest. Finally, the State must make a "clear showing that [a minor's] protection is being enhanced." *In re C.H.*, 210 Mont. at 203, 683 P.2d at 940. Mindful that statutes are presumed constitutional, and before turning to whether the State has met its burden to show justification for a limitation on a minor's right of privacy, we consider the equal protection clause within the context of a minor's right of privacy and the minors' rights provision.

### C. A Minor's Right to Equal Protection.

¶26 Pursuant to the Fourteenth Amendment to the United States Constitution, and Article II, Section 4, of the Montana Constitution, no person shall be denied equal protection of the laws. The guarantee of equal protection is a fundamental right contained in Article II which extends to minors by virtue of Article II, Section 15, "The basic rule of

18

equal protection is that persons similarly situated with respect to a legitimate governmental purpose of the law must receive like treatment." *Goble v. Mont. State Fund*, 2014 MT 99, ¶ 28, 374 Mont. 453, 325 P.3d 1211 (quoting *Rausch v. State Comp. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192). "When analyzing an equal protection claim, the Court follows a three-step process: (1) identify the classes involved and determine if they are similarly situated; (2) determine the appropriate level of scrutiny to apply to the challenged legislation; and (3) apply the appropriate level of scrutiny to the challenged statute." *Goble*, ¶ 28.

¶27 We must first identify the classes involved and determine whether they are similarly situated. *In re C.H.*, 210 Mont. at 198, 683 P.2d at 938. "The goal of identifying a similarly situated class is to isolate the factor allegedly subject to impermissible discrimination." *Goble*, ¶ 29. It is necessary for a similarly situated class to be identified because "[d]iscrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances." *Goble*, ¶ 29 (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995)). Thus, two groups are similarly situated if they are equivalent in all relevant respects other than the factor (here, the Consent Act) constituting the alleged discrimination. *Goble*, ¶ 29. *See Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 27, 325 Mont. 148, 104 P.3d 445; *Oberson v. USDA*, 2007 MT 293, ¶¶ 19-20, 339 Mont. 519, 171 P.3d 715.[4]

---

[4] A plaintiff also may bring a "class of one" equal protection claim, not applicable here. "Briefly stated, when 'state action does not implicate a fundamental right or a suspect classification, the plaintiff can establish a class of one equal protection claim by demonstrating that it has been intentionally treated differently from others similarly situated and that there is no rational basis for

19

¶28 Planned Parenthood maintains, and we agree, that the Consent Act creates a class of pregnant minors who want to obtain an abortion and a class of pregnant minors who do not want an abortion. For purposes of an equal protection analysis, both classes are composed of persons who are similarly situated for equal protection purposes—minors who are pregnant. Here, the classification discriminates against minors who choose a particular type of medical care—an abortion—because the Consent Act applies only to them; it infringes upon only those minors who choose to exercise their fundamental right to make medical judgments about their body in conjunction with a chosen health care provider absent governmental interference. Thus, the factor needing to be isolated is the Consent Act. We acknowledge there are perhaps other classifications which could indicate a minor's right to equal protection was violated by the Consent Act. However, here, the salient classification relates to the unavailability, unless a parent consents, of medical care which presents no bona fide health risk to minors. The *unavailability* of medical care to minors seeking an abortion *unless* they have parental consent and the *availability* of medical care to minors carrying their pregnancy to term *without* parental consent is the primary distinguishing feature of the Consent Act.

¶29 The second step in addressing an equal protection claim is determining the appropriate level of scrutiny to apply to the challenged legislation. If the legislation in question infringes upon a fundamental right, we must apply strict scrutiny. *S.L.M.*, 287 Mont. at 32, 951 P.2d at 1371. We have already determined that the Consent Act infringes

---

the difference in treatment.'" *B.Y.O.B., Inc. v. State*, 2021 MT 191, ¶ 38, 405 Mont. 88, 493 P.3d 318 (citations omitted).

20

on a minor's fundamental right of privacy. Minors, including pregnant minors, have a fundamental right of personal autonomy. Once a fundamental right is implicated, we must apply a strict scrutiny analysis to determine whether the State has met is burden of demonstrating a compelling state interest sufficient to justify its unequal treatment of a class and whether the Consent Act is narrowly tailored to effectuate only that compelling interest. *S.L.M.*, 287 Mont. at 34, 951 P.2d at 1372. We also must determine, as with the right of privacy, whether such an infringement is consistent with the mandates of Article II, Section 15, that it enhance the protection of minors. Here, the classification discriminates against minors who choose to have an abortion because only they have their right to privacy infringed. Clearly under Article II, Section 15, minors are afforded full recognition under the equal protection clause and enjoy all the fundamental rights of an adult under Article II, including the right of privacy. Thus, if the legislature seeks to carve out exceptions to the guarantee of equal protection, it must not only show a compelling state interest but must also show that the exception is designed to enhance the protections of minors.

**D.     Application of Strict Scrutiny to a Minor's Rights of Privacy and Equal Protection.**

¶30     The State proposes four compelling interests that justify the Consent Act: (1) protecting minors from sexual victimization; (2) protecting minors' psychological and physical wellbeing, (3) protecting minors from their own immaturity, and (4) promoting parental rights. Although not all the State's asserted compelling interests involve a medically acknowledged, bona fide health risk, the State continues to assert that abortion

21

is "fraught with major psychological, medical, and safety implications"; "[a]bortion is an invasive surgical procedure with serious medical risks . . . that include perforation or damage to the uterus, cervix, or another nearby organ; excessive bleeding or hemorrhage, requiring blood transfusion; infection introduced into the uterus from the cervix or vagina; and 'incomplete abortion.'" To the extent any of the State's compelling interests are premised upon a contention that abortion care presents a medical health risk, we may easily dispose of such a contention by relying on *Weems*. We begin by noting several of our conclusions in *Weems* that abortion care is safe and presents relatively minimal health risk and, in doing so, dispose of any of the State's claimed compelling state interests which might be premised upon abortion care presenting a medically acknowledged, bona fide health risk.

¶31 In *Weems* we considered whether limiting access to abortion care by preventing Advanced Practice Registered Nurses (APRNs) from performing abortions violated a person's fundamental right to access abortion care guaranteed by Montana's constitutional right of privacy. In concluding such a limitation was unconstitutional, we said the following about whether abortion care presented a medically acknowledged, bona fide health risk:

> The record is devoid of any evidence that APRNs providing abortion care present a medically acknowledged, bona fide health risk to Montana women. The State's argument is detached from the overwhelming evidence presented to the District Court that abortion care is one of the safest forms of medical care in this country and the world, and that APRNs are qualified providers. The State's reasoning rests on a faulty foundation: it puts aspiration abortions in the category of "surgery" because "instruments" are used to remove "human tissue"; because an aspiration abortion is "surgery" it has all the attendant risks of surgery—hemorrhaging, infection, post-operative care, and

22

monitoring; because abortion is "surgery" it should not be treated any differently than other elective surgery, which occurs in a clinic or hospital; because it is surgery it is not safe unless done where emergency backup is in place and where clinicians who can perform "surgery" are present. This reasoning would exclude APRNs from performing abortion care because, as the State posits, post-abortion care might be beyond what APRNs are capable of handling or authorized to do. Finally, at oral argument, the State represented that APRNs also should not perform medication abortions because complications from a medication abortion could lead to surgery. Therefore, according to the State, APRNs would not be authorized to dispense mifepristone or misoprostol.

.  .  .

The overwhelming evidence amassed in the District Court record established that abortion care is one of the safest procedures in this country and the world. Complication rates from abortion are similar to or lower than other outpatient procedures. When complications do occur, they are usually minor and easily treatable—normally at home or in an outpatient setting. Abortions remain one of the safest procedures when performed collectively by health care providers, including APRNs.

*Weems*, ¶¶ 46, 48. The State has failed entirely to address *Weems*; indeed, the State has not mentioned *Weems* and this Court's conclusions and analysis in any of its briefing, despite *Weems* being significant precedent for resolving this challenge.[5] Further, there is nothing in the record in these proceedings produced by the State which differs materially from the record evidence in *Weems* or demonstrates that abortions present a medically acknowledged, bona fide health risk. Having disposed of any compelling state interest which might relate to protecting individuals from a medically acknowledged, bona fide health risk, we now turn to some of the other arguments the State makes to justify the Consent Act.

---

[5] We note the State made only a passing reference to *Armstrong* in its Reply Brief.

### 1. Protecting Minors from Sexual Victimization.

¶32   Citing *New York v. Ferber*, 458 U.S. 747, 757, 102 S. Ct. 3348, 3354 (1982), the District Court concluded the State correctly identified the protection of children from sexual exploitation and abuse as a compelling state interest. However, as the District Court also noted, "[t]he State must do more, however, than cite a compelling state interest: it must demonstrate that the Consent Act is 'necessary to promote' this compelling state interest." *Driscoll v. Stapleton*, 2020 MT 247, ¶ 18, 401 Mont. 405, 473 P.3d 386. Under strict scrutiny, the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280, 106 S. Ct. 1842, 1850 (1986). "A statute is not narrowly tailored if it is either underinclusive or overinclusive in scope." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020). The District Court had no difficulty determining the Consent Act was not narrowly tailored to achieve the compelling state interest of protecting minors from sexual victimization. We agree.

¶33   In Montana, minors under the age of 18 but older than 16 may consent to sexual intercourse. Section 45-5-501(1)(b)(iv), MCA. Thus, many minors who seek abortions will be over 16 years of age because they are the ones lawfully allowed to consent, are nearer emancipation, and may be more likely to engage in consensual sexual intercourse. The State, however, presented little specific evidence relative to this large population of minors affected by the Consent Act. Further, the State has failed to logically connect and justify how the Consent Act prevents victimization of minors even when teen pregnancy is the product of an assault. All the Consent Act does is permit the parent to refuse consent

24

to a pregnancy that has already occurred. Thus, the Consent Act does not accomplish the State's asserted purpose of preventing the victimization of children from sexual assault and does not make it more likely that the sexual crime will be detected and punished.

¶34 This becomes more apparent when we assess the Consent Act within the context of other measures more specifically and aptly designed to enhance the protection of children. Montana has a mandatory reporting law that requires medical providers to promptly report any sexual abuse they know or suspect to be occurring. Section 41-3-201, MCA. A provider's violation of the mandatory reporting law can result in civil liability and criminal sanctions of up to five years in prison and $10,000 in fines. Section 41-2-207(3), MCA. As noted by the District Court, whether the Consent Act is in effect or not, providers must report evidence of sexual abuse to the State. The record is devoid of any evidence that the Consent Act provides enhanced protection over mandatory reporting laws, especially given that (1) some minors are being abused by their parents, and (2) a judicial waiver under the Consent Act does not require reporting.

¶35 The Consent Act's imposition of onerous and burdensome requirements designed to prevent evasion of the parental consent requirement by requiring notarization, government identification, proof of parentage, and a physician affidavit do not meaningfully assist in the prevention of sexual victimization of minors nor do they prevent the evasion of parental notice requirements. Mandatory reporting laws are an example of legislation that *does* advance the State's compelling interest of protecting minors from victimization. On this record, the State has failed to "clearly and convincingly" demonstrate that the Consent Act is narrowly tailored to serve only the State's compelling

interest of protecting minors from sexual abuse and exploitation. *Weems*, ¶ 45; *Armstrong*, ¶ 62; *In re C.H.*, 210 Mont. at 202, 683 P.2d at 940.

##   2.   Protecting Minors' Psychological and Physical Wellbeing.

¶36   The State contends that the Consent Act will ensure that, if a minor has an abortion, a parent or someone will be there to monitor for post-abortion complications and mental health trauma. States have an undisputed, compelling interest in "safeguarding the physical and psychological wellbeing of a minor." *Osborne v. Ohio*, 495 U.S. 103, 109, 110 S. Ct. 1691, 1696 (1990). The question, though, is whether the Consent Act is narrowly tailored to serve the State's compelling interest.

¶37   As we recognized in *Weems*, "abortion care is exceedingly safe" and "is one of the safest forms of medical care in this country and the world." *Weems*, ¶¶ 1, 46. Abortion care does not present a medically acknowledged, bona fide health risk to minors or adult women, and the State has not offered clear and convincing evidence in this case that minor patients are not treated for complications when they occur or that minors fail to follow-up on post-abortion care. We also held in *Weems* that the evidence overwhelmingly demonstrated delaying access to abortion care—as compliance with the onerous procedures of the Consent Act would cause, particularly in rural areas—increases the risk of abortion care and could foreclose the option of obtaining an abortion altogether. *Weems*, ¶ 43. The State has not presented any evidence that refutes this.

¶38   The American Medical Association and the American Academy of Pediatrics, and other medical organizations, are opposed to parental consent laws. They have concluded that forced parental involvement is more likely to deter minors from seeking care and has

26

no medically valid purpose. These medical organizations cite recent long term studies that have found those who obtained wanted abortions had a similar or better mental health outcome than those who were denied a wanted abortion. Moreover, the evidence establishes that receiving an abortion does not increase the likelihood of developing symptoms associated with depression, anxiety, post-traumatic stress, or suicidal ideation, compared to those who continue a pregnancy. *See Planned Parenthood of Cent. N.J. v. Farmer*, 762 A.2d 620, 636 (N.J. 2000) ("[Y]oung women do not suffer greater psychological problems than the young women who carry their pregnancies to term."). Importantly, requiring parental consent allows parents to prevent the abortion from ever taking place, but it does not require the parent to provide any assistance, support, medical care, counseling, or monitoring for a minor who has chosen to obtain an abortion. Nor is it inevitable that a parent who consents to an abortion will provide such help.

¶39 The abortion decision differs in many ways from other decisions that may be made during minority. As the District Court explained, "the means by which a woman's body nurtures and develops an embryo into a human child with which she will have a lifelong bond—is unique among all medical conditions," as is the decision to terminate a pregnancy.

> [T]he decision whether to continue or terminate her pregnancy has . . . a substantial effect on a pregnant minor's control over her personal bodily integrity, has . . . serious long-term consequences in determining her life choices, is . . . central to the preservation of her ability to define and adhere to her ultimate values regarding the meaning of human existence and life, and (unlike many other choices) *is a decision that cannot be postponed until adulthood.*

27

*American Academy of Pediatrics v. Lungren*, 16 Cal. 4th 307, 337, 940 P.2d 797, 816 (1997) (emphasis in original). There are few situations in which denying a minor the right to make an important decision will have consequences so grave, permanent, and indelible.

> It is difficult to conceive of any reason, aside from a judge's personal opposition to abortion, that would justify a finding that an immature woman's best interests would be served by forcing her to endure pregnancy and childbirth against her will.

*Hodgson v. Minnesota*, 497 U.S. 417, 475, 110 S. Ct. 2926, 2958 (1990) (Marshall, J., concurring in part and dissenting in part).

¶40 The Consent Act is not narrowly drawn to serve the purpose of monitoring mental health trauma or post-abortion complications.

### 3. Protecting Minors from Their Own Immaturity.

¶41 The State asserts that it has a compelling interest in protecting minors from their own immaturity and that minors engage in fully informed decision-making. We agree. The State has a special, indeed compelling, interest in the health, safety, and welfare of its minor citizens.

¶42 Although recognizing the State's compelling interest, we are nonetheless tasked with deciding whether the Consent Act narrowly effectuates that interest. Here, the weakness in the State's argument is that the Consent Act singles out only minors seeking an abortion, and not those who choose to carry their pregnancies to term. The State's argument is illogical: minors who choose to carry their pregnancies are not at risk of making an immature decision, while those choosing abortion must be protected against their immaturity. In Montana, minors are empowered to consent to various

28

parenting-related services without their own parents' or guardians' consent—including the "prevention, diagnosis, and treatment" of pregnancy. Section 41-1-402(2)(c), MCA. While the Consent Act prevents a minor from obtaining an abortion without parental consent, contrarily, a minor "has the right to relinquish all rights to that minor parent's child and to consent to the child's adoption" without obtaining parental consent. Section 42-2-405(1), MCA. Minors can consent to many types of health care, including pregnancy-related care, but abortion is singled out.[6]

> It is particularly difficult to reconcile defendants' contention—that parental or judicial involvement in the abortion decision is necessary to protect a minor's emotional or psychological health—with . . . statutory provisions authorizing a minor who has given birth to consent, on her own, to the adoption of her child. The decision to relinquish motherhood after giving birth would seem to have at least as great a potential to cause long-lasting sadness and regret as the decision not to bear a child in the first place.

*Lungren*, 16 Cal. 4th at 353, 940 P.2d at 827 (citations omitted).

¶43    The Consent Act bestows upon parents what has been described as a "veto power" over their minor's abortion decisions, effectively shifting a portion of the minor's fundamental right to parents. *State v. Planned Parenthood of Alaska*, 171 P.3d 577, 583, 2007 Alas. LEXIS 141,**17. "In practice, under the [Consent Act] it is no longer the pregnant minor who ultimately chooses to exercise her right to terminate her pregnancy, but that minor's parents. And it is this shifting of the locus of choice—this relocation of a

---

[6] Though the State refers to other statutes that require a parent's consent or involvement, the relevant inquiry here are the statutes pertaining to a minor's decisions when the minor occupies the position of parent or prospective parent.

fundamental right from minors to parents—that is constitutionally suspect." *Planned Parenthood of Alaska*, 171 P.3d at 583.

¶44 Importantly, the District Court held:

> The problem with the Consent Act is that it does not provide minors with resources, counseling, and guidance to help them navigate this choice; rather (except in cases of a granted judicial bypass or other exception), it takes the choice away from them, giving it instead to their parent or guardian. The various consent forms required by the Consent Act do assure that a discussion takes place about the risks of the abortion, but the discussion called for by the consent forms is unidirectional: it does not include anything requiring a discussion about the consequences and risks of carrying a pregnancy to term, consequences that will vary from case to case based on the circumstances of the expectant mother. Thus, the required form does not ensure that parent and child are provided with the pros and cons of both abortion and carrying a child to term to make a fully informed decision; rather, the form assures only that they have been provided with one side of one possible decision: the "risks and hazards" of an abortion.

The Consent Act "guarantees no more than a one-way conversation and 'allows parents to refuse consent not only where their judgment is better informed and considered than that of their daughter, but also where it is colored by personal religious belief, whim, or even hostility to her best interests.'" *Planned Parenthood of Alaska*, 171 P.3d at 585.

¶45 Given these considerations, we conclude the Consent Act is not narrowly tailored to advance only the compelling purpose of protecting minors from their immaturity.

### 4. Promoting Parental Rights.

¶46 The State argues the Consent Act "protects parents' long-recognized fundamental rights in the custody, care, and control of their children." Parents do have a fundamental right to parent. *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054 (2000). As the District Court held, the promotion of healthy families is undoubtedly a compelling state interest.

30

But not all families are healthy, and the Consent Act empowers parents who do not make decisions in their children's best interest to control an important fundamental right of their child. The consent requirement empowers the parent to take the decision about whether to have an abortion or carry the child from the minor and goes far beyond merely facilitating family involvement and guidance, and potentially establishes conflict within the family unit.

¶47    It is difficult to conclude that providing a parent with unilateral, veto power over a minor's exercise of a fundamental right, made in conjunction with the minor's care provider, will strengthen the family unit. Such veto power is unlikely to enhance parental control or strengthen the family unit where the minor and nonconsenting adult are obviously in conflict and the family structure is fractured, even beyond the existence of the mere pregnancy itself. Where a minor seeks an abortion and that decision is vetoed by a parent, the family *fundamentally* is in conflict.

¶48    The State's parental rights argument is unpersuasive given the minor's own fundamental right of privacy and because the minors' rights provision expressly affirms the rights of minors except when necessary to enhance a minor's *own* protection—not the protection of a parent. Further, any parental right that exists within this framework is a right to parent free from state interference, not a right to enlist the state's powers to gain greater control over a child or to make it more difficult for a minor to exercise their fundamental rights. *See Farmer*, 762 A.2d at 638 (The State may not interfere with a parent's upbringing of a child, but it does not follow from such a proposition that parents

have a right to enlist state support to prevent or even be informed about a child's exercise of her own constitutionally protected rights.)

¶49 Based on the foregoing, we conclude the Consent Act burdens a minors' fundamental right of privacy and creates a classification between minors who choose an abortion and those choosing to carry their pregnancy to term. Only minors who choose an abortion have their right of privacy infringed. We further conclude the State has failed to present adequate justification, supported by clear and convincing evidence, that the Consent Act is narrowly tailored to further only a compelling state interest in the protection of minors.

¶50 The evidence establishes, with no genuine dispute of fact, that abortion care is one of the safest forms of medical care available in this country and the world. Medical risks for abortion are considerably lower than for pregnancy and childbirth, and, in general, adolescents show no substantial psychological effects from abortion. The consequences of not being able to terminate an unwanted pregnancy can be decidedly more traumatic and severe than for obtaining an abortion. Adolescent mothers may not be able to complete high school and will remain dependent on family, a partner, and unable to take care of themselves. Adolescent mothers who choose to continue their pregnancy are free to do so without any requirement of parental consent. But the minor who is presumed by the Consent Act to be too immature to decide about having an abortion will, if she continues her pregnancy, become the mother of an infant, fully responsible for the infant's life and for decisions about infant's medical care and upbringing.

### E. Judicial Waiver.

¶51    The State attempts to save the Consent Act by arguing that the judicial waiver provision "guarantees that any minor who should obtain an abortion without parental oversight can do so." However, the judicial waiver provision cannot remedy the maladies of the Consent Act, which is not narrowly tailored to accomplish a compelling State interest, because the provision, itself, singles out minors who choose to have an abortion and introduces unnecessary stress, delay, and potential increase in the risk of abortion and inability to obtain an abortion altogether. The judicial waiver provision will introduce delay into the decision of whether to obtain an abortion, which could increase the chances of having to obtain an abortion later in pregnancy and thus, increase the possibility that a minor may not be able to receive a safe and legal abortion. The necessary process to obtain a judicial waiver forces delay in care which can increase stress and cost—especially if delay takes a more affordable option, such as medication assisted abortion, off the table.

¶52    As discussed, minors have a fundamental right to privacy and equal protection. In complete contravention of these rights, the judicial waiver procedure requires a minor to file a petition disclosing her private medical information—her pregnancy—to appear in court and subject herself and her competency to the scrutiny of strangers. It requires the minor to tell multiple people—the judge, her attorney (if any), court personnel—very personal details about her life and to be questioned about deeply personal matters. Thus, forcing minors to go to court to access abortion care compromises a minor's fundamental right to privacy—which includes the right to make medical judgments in partnership with a chosen health care professional free from governmental interference.

33

¶53    For minors who seek an abortion but choose not to seek parental consent, the judicial waiver vests a different adult—the judge, rather than the parent—with veto power.  A similar veto power does not exist for a minor who decides to continue, rather than terminate, her pregnancy—these minors retain their privacy, including the right to procreative autonomy.

¶54    The legal system is intimidating, confusing, and difficult to access, even for those who have legal representation and do not have time-sensitive legal problems.  These complications are made worse for those with time-sensitive medical conditions who begin the process without counsel.  Even if a minor obtains accurate information as to the process—which is certainly not guaranteed—the minor faces other hurdles such as missing school, work, and other activities; lack of transportation, legal counsel, and financial resources; and taking time to prepare and file a judicial waiver petition, appear in court, and adequately present her position.  Minors with the least financial resources and the greatest access impediments, face greater challenges in seeking a timely judicial waiver. These financial and logistical barriers may be even more pronounced for indigenous and marginalized people.

¶55    The judicial waiver provision thus cannot save the Consent Act, a statute which infringes upon a minor's fundamental right and is not narrowly tailored to serve a compelling state interest. There is no state interest that the judicial waiver provision serves other than attempting to save the Consent Act.  We conclude that the judicial waiver provision of the Consent Act does not enhance protections for minors who choose to

exercise their right to obtain an abortion; rather, it delays their access to medical care which we have determined they have a constitutional right to obtain.

## CONCLUSION

¶56 The Consent Act conditions a minor's right to obtain an abortion on parental consent unless a judicial waiver is obtained. It imposes no corresponding limitation on a minor who seeks medical or surgical care otherwise related to her pregnancy or her child. The State responds that its substantial interests in protecting minors from victimization, protecting minors' psychological and physical wellbeing, protecting minors from their own immaturity, and promoting the rights of parents to raise their children justify this differential treatment and the infringement on a minor's right of privacy. We decide today that the classification created by the Legislature violates the fundamental right of a minor to control their body and destiny, *Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, and *Weems v. State*, 2023 MT 82, 412 Mont. 132, 529 P.3d 798, without adequate justification from the State, and cannot be sustained against Plaintiffs' privacy and equal protection challenges. Further, we conclude that the Consent Act does not enhance the protection of minors under Article II, Section 15, of the Montana Constitution. We emphasize that our decision is not based on, nor do we presume to answer, the profound questions about the moral, medical, and societal implications of abortion. At the end of the day, those questions are left to the woman who must decide for herself. We also acknowledge that the State has a substantial interest in preserving the family, protecting minors, and protecting the rights of parents to raise their children. However, when weighed against the right of a minor to make the most intimate and personal decision of whether to

35

carry a child to term, the interests expressed by the State must be furthered by and substantially related to the legislation itself, and the legislation must be narrowly tailored to meet only those legitimate legislative goals. A minor's right to dignity, autonomy, and the right to choose are embedded in the liberties found in the Montana Constitution. Because a minor's right to control her reproductive decisions is among the most fundamental of the rights she possesses, and because the State has failed to demonstrate a real and significant relationship between the statutory classification and the ends asserted, we hold that the Consent Act violates the Constitution of the State of Montana.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER
/S/ ELIZABETH A. BEST
District Court Judge Elizabeth A. Best
Sitting for Chief Justice Mike McGrath

Justice Jim Rice, specially concurring.

¶57 I concur with the ultimate holdings of the Court, including the holding that the Consent Act fails to sustain strict scrutiny review and thus violates Plaintiffs' right to privacy under Article II, Section 10, of the Montana Constitution, which the Constitution extends to minors. *See* Mont. Const. Art. II, § 15; *Matter of J.W.*, 2021 MT 291, ¶ 23, 406 Mont. 224, 498 P.3d 211; *In re C.H.*, 210 Mont. 184, 202, 683 P.2d 931, 940 (1984). I also

36

agree that the Consent Act violates equal protection, but I disagree with the analysis employed by the Court in that regard, and I write separately to address several concerns.

¶58    First, the Court mentions the long delay that occurred in this case because of "a lengthy series of judicial substitutions, recusals, and retirements." Opinion, ¶ 4. These occurrences do not excuse the judiciary's failure to address this case in a timely fashion. The District Court was forthcoming about the problem, detailing the processing turns and presiding judge turnovers that resulted in this case being passed along like a hot potato and delaying resolution for almost *eight years* after this Court's remand in 2015. The District Court acknowledged that "the case went dark" despite the multiple submission notices the State filed to remind presiding judges about the need for resolution. I appreciate Judge Abbott's diligence when the case finally landed on his court's doorstep, but, overall, the judiciary's handling of this case was unacceptable. While perhaps no single individual or court bears all the blame, the public's confidence in the judiciary rests on the expectation that the courts will faithfully execute judicial duties. The public deserves better than what occurred in this case, and courts must do better.

¶59    I agree with the Court's effort to clarify our prior holding in *In re S.L.M.*, 287 Mont. 23, 951 P.2d 1365 (1997). The Court first states, in regard to Article II, Section 15, of the Montana Constitution, that "minors do not have *more* or *enhanced* rights in comparison to adults." Opinion, ¶ 21 (emphasis in original). In *In re S.L.M.*, we had stated:

> Clearly under Article II, Section 15, minors are afforded full recognition under the equal protection clause and enjoy all the fundamental rights of an adult under Article II. Furthermore, *if the legislature seeks to carve exceptions to this guarantee, it must not only show a compelling state interest*

*but must also show that the exception is designed to enhance the rights of minors.*

*In re S.L.M.*, 287 Mont. at 25, 951 P.2d at 1373 (emphasis added). Notably, the District Court cited this language and relied upon it. However, the holding is clearly contrary to the plain language of Article II, Section 15, which states that "persons under 18 years of age" are entitled to the fundamental rights set forth in Article II "unless specifically precluded by laws which enhance the protections of such persons." Thus, without engaging in a full analysis of the point, I concur with the Court's statement in Footnote 3 that *In re S.L.M.*'s holding in this regard "was incorrect" and is "repudiate[d]," such that it should not be cited or relied upon in the future.

¶60 Turning to the equal protection issue, I would not, as a threshold matter, reach this issue because the Court is already declaring the Consent Act to be unconstitutional on the basis of the right to privacy under Article II, Section 10 of the Montana Constitution, and it is thus unnecessary to the outcome of the challenge to the Act for the Court to reach and address an additional constitutional issue. "[C]ourts should avoid constitutional issues whenever possible." *350 Mont. v. State*, 2023 MT 87, ¶ 25, 412 Mont. 273, 529 P.3d 847; *State v. Johnson*, 2023 MT 143, ¶ 8 n.1, 413 Mont. 114, 533 P.3d 335.[1] However, out of

---

[1] *See also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2313 (2022) (Roberts, C.J., concurring) ("Following that 'fundamental principle of judicial restraint' . . . we should begin with the narrowest basis for disposition, proceeding to consider a broader one only if necessary to resolve the case at hand. *See, e.g.*, *Office of Personnel Management v. Richmond*, 496 U.S. 414, 423, 110 S. Ct. 2465, 110 L. Ed. 2d 387 (1990). It is only where there is no valid narrower ground of decision that we should go on to address a broader issue . . . . *See Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 482, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007) (declining to address the claim that a constitutional decision should be overruled when the appellant prevailed on its narrower constitutional argument.)").

a concern regarding the Court's equal protection analysis for purposes of our future jurisprudence, I will address the merits.

¶61 The Court explains that we analyze equal protection claims in a three-step process: "(1) identify the classes involved and determine if they are similarly situated; (2) determine the appropriate level of scrutiny to apply to the challenged legislation; and (3) apply the appropriate level of scrutiny to the challenged statute." Opinion, ¶ 26 (quoting *Goble v. Mont. State Fund*, 2014 MT 99, ¶ 28, 374 Mont. 453, 325 P.3d 1211); *see also Rausch v. State Comp. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192. Addressing the first step, the Court defines the relevant classes created by the Consent Act as "pregnant minors who want to obtain an abortion and . . . pregnant minors who do not want an abortion." Opinion, ¶ 28. It is this designation of the classes under the first step with which I disagree.

¶62 The Court correctly notes that a similarly situated class is one that is "equivalent in all relevant respects other than the factor constituting . . . the alleged discrimination," and that the "goal of identifying a similarly situated class is to isolate the factor allegedly subject to impermissible discrimination." Opinion, ¶ 27. However, in this case challenging the Consent Act, which regulates youth access to abortion, pregnant minors who are not seeking an abortion are not "equivalent in all relevant respects" to pregnant minors who are seeking an abortion. The group not seeking an abortion does not interact with the Consent Act at all. For purposes of the equal protection analysis, the mere existence of the Consent Act cannot "create" a class to whom it could never apply, i.e., women completing their pregnancy, and therefore that group is not the result of a legislative classification.

39

Instead, the two groups of pregnant minors are created by the different personal choices those groups have made. Consequently, the classes utilized by the Court are not created by the Consent Act, because the Act has no application to the group not seeking an abortion, and the Court's determination that "the factor needing to be isolated is the Consent Act" is incorrect.

¶63 Rather, the proper distinction created by the Consent Act is between minors seeking an abortion and adults seeking an abortion. In brief, the distinction is one of age. The plain language and purpose of the Consent Act make this distinction clear. As the Court notes, the Consent Act "conditions a *minor's* right to obtain an abortion on parental consent unless a judicial waiver is obtained." Opinion, ¶ 1 (emphasis added). The Act provides a process for obtaining parental consent for a minor's abortion that involves numerous steps and complications. However, the day the minor turns 18 years old, all of the conditions imposed by the Act disappear, and the now 18-year-old person may obtain an abortion without satisfying these requirements. The Act thus exempts from its requirements adult women seeking an abortion. As the Court correctly explains, similarly situated classes are equal in all relevant respects, except for the factor constituting the facially discriminatory aspect of the law at issue. The Consent Act does not seek to regulate abortion *per se*, but instead seeks to establish the conditions that must be satisfied for *a minor* to obtain an abortion, and to exempt an adult from the conditions. Thus, the distinguishing "factor" of the legislative classification at issue is age. The groups are similarly situated because they are both comprised of women who are seeking abortions, and are treated differently on the

40

basis of their age. This is also a more appropriate designation of classes for this particular case, involving application of Article II, Section 15.

¶64 Having concluded that the relevant legislative classification is one based on age, I would next move to a determination of the appropriate level of review. *Goble*, ¶ 28. Typically, facial discrimination based on age is subject to rational basis review. *Jaksha v. Butte-Silver Bow Cnty.*, 2009 MT 263, ¶ 20, 352 Mont. 46, 214 P.3d 1248. However, the regulation at issue here involves the right to seek an abortion, which we have deemed a fundamental right of privacy. *Armstrong*, ¶ 42. Therefore, strict scrutiny review must apply to the Consent Act. *See S.L.M.*, 287 Mont. at 34, 951 P.2d at 1372. Consequently, I agree with the Court that the Act is not narrowly tailored to satisfy the State's stated compelling interests.

¶65 I concur in the Court's judgment.

/S/ JIM RICE